162695 In Re Francis Mr. Klatsman, whenever you're ready. May it please the court, I'm Howard Klatsman, on behalf of Appellant Francis. Thank you for the opportunity to speak today. Seven years ago, Mitch Francis filed a patent application for a virtual travel magazine for the FDL. After extended prosecution and an appeal was filed, the decision was issued by the PTAB. The reason for the present application has made it this far as a result of the examiner's and the PTAB's failure to explain the pertinence of the various cited references in a manner sufficient for the appellant to fully understand the rejection and to respond in a known manner. This was compounded by the PTAB's decision sustaining the rejection with even less explanation than was provided by the examiner. I've been a patent practitioner for over 25 years and an examiner for three years. As such, I've dealt with these issues daily. Fortunately, the vast majority of examiners are very good, provide comprehensive office actions. However, there are instances where, for whatever reason, examiners refuse to provide details despite our request for further explanation. I suspect they sometimes believe we as patent attorneys are being too adversarial. Well, rather than analyzing what they do in general, what is it specifically that you think the patent op that was not sufficiently articulated as a basis for the final decision? I mean, they pointed to specific references, specific paragraphs, and those references with respect to the disclosures. So I know you disagree with their result, but what was deficient in terms of their analysis? Sure. Start with video clip. What's that? Video clip. That's one of them. That's paragraph 43 in Rose. That's line 16. Sure. And that shows the video. That shows that limitation, right? Mm-hmm. OK. So if the examiner, when they said Rose 43, had said video, line 16, you wouldn't be complaining. I think we would still be complaining, Your Honor. Because? Because in presenting a rejection, it's not enough just to create a shopping list of references and go out and find those elements in various references. You have to combine them in a way that fulfills the obligations of KSR. What I did is I went through Rose, and I saw Rose 43, line 16. That's the video. Booking a reservation, that's Rose 59, line 2, and following. Reviewing rates, that's Rose 56, line 15. Reviewing reviews, that's Rose 57, line 17, 18. Rose 58, line 8, 9. Options shown in a window, that's Rose 59, lines 1 through 4, relating back. Right? So they're all there. Sure. So, instead of the examiner having said what I just said, and then the board saying it again, because you don't want the board just to agree with the examiner. No. The board says it chapter and verse. Then you say what would be missing was what his friends put together. Your argument is that these specific limitations, 1, 2, 3, 4, 5, were nowhere found in the prior art. Right, and there's one additional limitation that's part of that clause that says that the selected options being provided for viewing by the consumer in the form of windows displayed within the virtual. Well, that I think is, that's Rose 59, lines 1 to 4, referring back to figures 8 and 9. Okay. Figure 8 and 9 is a slam dunk. I mean, it's a window. The 9 opens up from an 8. Well, I respectfully disagree. Rose deals with a web page. Okay. And it's interesting to note that web is owned by OpenTable, so anybody who's made reservations to OpenTable might be familiar with how it works. It requires you to have a banner on the left side, the Rose application, which is very typical, and you click on various hyperlinks, and it pops up a whole new web page with that information, whether it be a video, whether it be reviews and rates, whether it be further information. Now, what the inventor was trying to do here was to create a virtual magazine that took the user beyond the conventional website, which people find difficult to use, and brought them to a world that replicated the travel magazine that you normally find when you get to your hotel. If you're traveling somewhere and you get to the hotel, there's a travel magazine, you flip through it, it's got entertainment, it's got shows, it's got hotels, restaurants, you can flip through it. The difficulty in doing this was of the feeling that if you could provide this in a video format or an internet format, consumers could go and on their way to their destination, look at the materials, figure out where they wanted to go, what they wanted to do, and the next step would be you can make reservations as you're traveling. You can book a hotel as you're going to your destination. Now, the key to all this is that it has to feel like a magazine, and it really, at the end of the day, has to feel like a magazine, not like a website. So, that last clause about the videos, the rates, and all that being within the same window as the magazine is not a throwaway clause. It's something actually very important to the invention, which is that if, in fact, you were to look at a video, let's say. Let's say you're thinking about going to a show, you watch a video. Well, if you click on that video and you go to a whole other webpage, you go to YouTube, you're not getting the magazine experience. This is not like sitting in your hotel room flipping through a magazine and creating that experience. What exact language do you think calls that out in Clause 3? Is it entertainment booking? Is it the language booking magazine? No, it's the very last sentence. Selected options being provided for viewing by the consumer in the form of windows displayed within the virtual travel restaurant entertainment booking magazine. And if you read that in conjunction with the specification, I mean, the background of the invention is very clear that webpages have problems. The background of the invention tells the story that I was just telling, is that these places, webpages exist. We're not claiming to have invented videos, any of that. But this idea of bringing somebody into the world of a virtual magazine didn't exist, and Rose doesn't disclose it. The Surrey doesn't disclose it. And that's why the combination of the elements and why they would be pulled together is so important to this invention. If that answers the question. Yeah, but I don't understand why OpenTable isn't doing the same thing for you in connection with being able to book a reservation at a table as you're moving through one city after another. You're in your car, you're zooming along. It's basically like a magazine for reservations. You're actually opening Zagat. But they don't. They provide you a webpage. Well, they provide you with something that's replicating. It's a virtual search engine that searches in to, say, Zagat. Sure. Once again, I'll return to the point that in our background, we acknowledge that those existed. That the webpages for reservations existed prior to this. But what didn't exist was the idea of bringing the magazine experience, the travel magazine experience, I should say. Because the Surrey does talk about flipping pages and all that. To bring the travel magazine experience to the consumer. And that's where I think the invention lies. And that's where our problem with the way it was addressed by the patent office. Right, so travel magazine experience plus. Because the travel magazine, I read travel and leisure, these magazines at home. But they don't allow me to put my finger on something and get a reservation. No, it's a travel magazine that's even better than a travel magazine. Yes. Exactly. Okay. And what our problem with the rejection from the patent office. And like I said, we deal with it daily. And we run into these situations on a regular basis where it's almost a standoff between us as the patent attorney and the examiner. As to who's going to break first and give more. The examiner gives us the reference to the specific columns and lines. And then we come back and say, oh, we've read it, but we don't really see it. Because we as patent attorneys don't want to do the examiner's work. If we read that, we can interpret it in much the same way the solicitor has. I mean, the solicitor has reviewed those articles and created a very extensive argument for obvious reasons. But that's not what the examiner did. Well, you seem to have, right now, it seems to me that you've got most of your eggs in the final basket. Yep. Which is, you know, displayed, the window displayed within the magazine. That's where I hear you. Well, I think that... Well, I mean, we've identified where the other limitations are. But the whole room together, that's why that class is one view. I hear you, but I'm listening to your eggs in the window basket. Right. So, assuming it's there, did you, can you point to me in the record where something in here where you traverse the rejection by saying, hey, wait a second, you don't understand the window limitation? Well, yes, we did. We did it multiple times. Mike, can you give me a where? Sure. I'd like to know where. Where are you complaining that the examiner simply doesn't understand the significance of this final limitation about the window that opens in the magazine? I should have it on the top of my tongue, but... Okay. We talked about it at appendix 184, 207 to 208. 184. I'm not sure where those are. I have my notes here. I know we responded to it in our reply brief to the examiner's answer, explaining that the windows clause was never addressed. You don't, at 184, you don't specifically point out the window. Right. I'm into my rebuttal period. If you will excuse me for a moment, and I will find those places during my period. Okay. Thank you for your time. Good morning, Your Honor. May it please the Court. Just starting with this windows argument that my friend made, that was not made below. There was nothing in the brief to the board that called out to the board or the examiner that somehow the windows part of the limitation was not met. The briefing, actually, on this whole last links limitation was fairly short as well. Much of the briefing below concerned other aspects of the rejection. It was really just at the end, there's a paragraph in Francis' briefing that says, you rely on these paragraphs. We don't see it. They talk about a web module, but we don't understand what it means. And there's nothing that calls out this particular windows argument. And in fact, I found it somewhat hard to discern even from the briefs to this Court. Maybe it was made. Whose burden is it to be specific in this game we're playing? Isn't it the examiner's burden to be specific? It is the examiner's burden to be specific. And here, because the reference was so clear, and because those paragraphs. You're reciting what I recited, but I mean, sure, the matter is on the windows limitation. The only way I can find the windows limitation is 59, lines 1 to 4, kicking back to figures 8 and 9. And so figure 8 and 9 shows that's open table, right? The window is not being opened in the magazine, is it? Well, figures 8 and 9, I think it is showing the windows that are open in the magazine. 9 is what opens when you click on the table reservation, 177 in figure 8. Right. So if you look at 9, you still have, at least have two answers. The first one is if you look at figure 9, it still shows the same sidebar that you had in the previous window with menu specials, line list photos, reviews, etc. So it's got the same font and the same format. The tabs look the same. So that's an indication that it's in the same magazine if you're comparing figure 9 to figure 8. And then also, generally, what is a magazine? The magazine is just all the pages that are shown. And this is in the magazine. You get that it looks like a paper magazine from Berserke, but the magazine is... For purposes of open table, figure 8 is the magazine. And then you open things in the magazine if, indeed, figure 9 is opening right on top of figure 8. And if it is, either way, if it's opening right on top of figure 8 or if it's not opening right on top of figure 8, it's still in the magazine because the magazine is simply what shows up on the screen. You have the same, probably the same web, beginning of the web address. There are each pages in the magazine. And this was actually... There's an argument here. There's a new basic argument. It's a question that's like you sitting here in the court for the last argument question of what being shown. I mean, for purposes of the last argument, let's assume that the board had said, well, if you want to see a reason to combine, go look at the Clevenger Declaration, period. That's all they saw. It didn't tell you anything in it. That would probably be insufficient. It would depend on the facts. I think if the Clevenger Declaration, paragraph 2, said the reason to combine is, and I tried not to listen to that case as much as possible, but if, you know, the things are modular and it's like Asano and KSR. So what you're saying is it okay for both the examiner and the board to use shorthand, where when you translate the shorthand, you come up with the explanation? Yes, Your Honor. If it's clear enough, and it is a shorthand, really there wasn't much more for the examiner to do here than to just recite. Well, he could have done what I did. He could tell you which line it arose. He could have said which line, and I admire Your Honor for doing that because there weren't line numbers, and so you had to go and make your own line numbers, usually when they're simple paragraph numbers. There are a few tasks that we're talking Excel. But beyond creating line numbers, they did cite to the specific paragraphs. There aren't very many of them, and really other than just writing out those paragraphs, there isn't a whole lot more to say. I'm a little bit surprised about this. I'm not sure, actually, to this day, if the argument on the windows is that the windows, your argument, that the windows need to look like they're in the magazine, or if the argument is that because the reference didn't discuss that explicitly discuss a window for anything other than reservations, that doesn't disclose... What I couldn't tell was whether or not opening... For example, in Amazon, you open a window, and it goes off of Amazon's website to somebody else's. I couldn't tell whether this, by opening it in the magazine, meant that it had to stay all in the magazine, or whether you could open in the magazine and nonetheless transfer electronically to somebody else's site for making the reservation. And that's one... Again, I'm not sure to this day, but if that's what it is, then I think... I'm going to come back. Whose burden is it to answer the questions that you and I are asking now? Does the examiner have to tell you how he understands the window, the window opening in the magazine, and to say, I believe that in this claim, it means opening clearly within the magazine, not going to an external source, and therefore I find OpenTable does the same thing? It is the examiner's burden to make the prima facie case, but it's not the examiner's burden to come up with every single... I don't want to say crazy, but every single potentially unsupported argument that someone might come up with and need it. I don't... How do we know that? Is there a case law that tells us exactly what the nature of the examiner's burden is, and understanding what the claim is, and then being able to tell you why the prior order does or doesn't read on the claim? Well, we do have the CFR site that gives the examiner's burden is to say what the... give a reference, cite to the specific sections of the reference, and if not apparent, explain the significance. And certainly in a complex technical case where there might be more doubt about what the reference teaches, one might need to give an explanation beyond citing to the specific paragraphs of the reference. But I will submit that here, this is pretty simple. You just look at the part of the specification, it cites to the figures, and that there really isn't much more to say here that isn't apparent from the reference itself. It's your position that the windows argument wasn't made before the examiner, right? And so had it been, though, let's just assume for a minute that it was very clearly made before the examiner, that at that point would the examiner have some sort of duty to respond to that? Yes, and I'm struggling to figure out exactly where it's from, but yes, they would. I mean, if the windows argument were clearly made, the examiner should respond to it and explain... I guess it would stem from it's not apparent anymore. Maybe that's... Well, if you traverse a rejection successfully, then you're going to win. Right. If we see that, see examples of that occasionally. Right, and that would be why one would expect the examiner to address it and say are they convinced or not by the traversing of the... Was there an interview in this, during this course of this prosecution history at all? Not that it's required that someone have an interview. I'm just curious. I thought I'd have to double check, but I don't think it should be in the record, and I don't think there was one. I can't ask my friend here to confirm, but I'm fairly certain. Well, your view of the way the system works is the examiner makes the prima facie case for his or her rejection, and then the burden of going forward transfers back to the applicant who then traverses, and on the grounds of the traverse then put the examiner back into a burden of coming forward. Yes. Then if the traverse raises some new issues... I mean, we don't, in this record, we don't see a dialogue of that sort with respect to the wind-up limitation. At least I didn't see it. We asked him to look. I mean, if you look page appendix 171 through 172, that's the brief by Francis to the board. Those are the pages that are most relevant to this limitation, so it starts at the bottom of 171. It's a still-further claim. One requires, and he lists the limitation, and the limitation is the whole last bit. Well, one of those limitations is mentioned twice in the generic report. I'm sorry, can you... The windows limitation is mentioned twice, one on 172, one on 171, in a generic way. In a generic way, because there's a lot in that limitation. So it just says none of the things in the limitation are met, including the links to each of the hotels, restaurants, attractions, graphical user interface, provide links offer an option, option video promo, booking a reservation, viewing rates and reviews, selected options being provided for viewing by the consumer from Windows, which is part of it. Then it just says that features may be disclosed and are suggested by Rose or Pesergi. The examiner says, look at paragraphs 43, 55 through 59, but 43 relates to a web helper module and doesn't teach the required feature, and 50 through 59, I've been reviewed and do not prepare to close these limitations, and then it just sort of sums up. It says that they think that the web helper module doesn't disclose video, which is what I thought maybe they were arguing here. Was there maybe going to be their primary argument, but it does, and it says it very plainly in paragraph 43, video clips. So beyond that, and then looking at the reply, I don't know if I can flip the reply, but there wasn't much more. Here it's on appendix 190 to 191, and it just sort of windows part of that limitation. It just says the examiner didn't say enough. And where there's no, especially where there is no, I can see the concern that maybe the examiner could say more, but where there is no suggestion that there's anything wrong with it substantively, it seems not an ideal case to be concerned about that. It seems like they're both, both the applicant and the patent examiner are talking in kind of more in generalities with respect to the limitation. The limitation is met at these paragraphs. The limitation is not met without specifying exactly what about the limitation is not met. And it's like a five-line limitation. Yeah, and I see that. I also think that here where the fire, I guess, was focused, if you look at the briefing to the board, there's lots of pages on other issues. And I think that responding in kind to the amount of weight that is given to it by the applicant or by the appellant is rational when there is such tight deadlines for the board. And if it seems like this is the end, and it was, the final argument in the brief, the very final argument, which wasn't given much attention, then maybe it was reasonable for the examiner and the board also not to give it an extra wordage. Unless there's anything else, Your Honor. Thank you. Okay. Returning to Judge Stoll's question with regard to the interview, there was not an interview conducted in this application. I can tell you from first-hand experience why not. Interviews are generally very helpful in remedying issues. My experience has told me for many years that when you have an examiner who is doing what this examiner did, which is basically copying the claim and putting a bunch of reference rules next to it, if they don't move from that after one or two office actions, that they're not going to move. When I go in for an interview, I don't want to have an argument with the examiner. I want to have something concrete. Where is it in the appendix that you raised your window argument? Oh. And before you had an examiner and then before the board. Sure. It was first raised in an amendment on Appendix 126 in the pre-appeal brief at Appendix 146. Wait, wait, wait. 126? And where is it on 126? Now, I can tell you each time that it is presented is presented as a lot. The third clause. A quotation of author limitation. Exactly. That goes back to my answer. Where in the record did you refer to the windows limitation with some flesh on it? Other than flesh on it? Yeah. Other than just citing it as a fact. I want a fleshy record. In hindsight, we didn't get into it in as much flesh because we did not have a rejection. I want to have any flesh. A pound, you know. Well, we talked about the web module not addressing that limitation. Our problem was from the beginning that we didn't know where the examiner was coming from with the rejection. We tried to make the point that, hey, we've read it. We don't see it. We need a further explanation. Why don't you specifically point out what the reference doesn't teach relative to the claim? Why don't you point that out? You don't see it. There's one reference being relied on by the patent examiner. Sure. One reference being relied on and then you read that reference and then it's your burden to respond and explain why that reference does not teach the specific limitations. I don't understand why that couldn't be done given the citation of paragraphs by the examiner. Mm-hmm. I can explain from a patent practitioner's standpoint. No, just in this case. I don't want to know about your general experience. In this case? Okay. And it applies to generalities is that I see it that it's the burden of the patent office to make their prima facie rejection. They have to fill the obligations of KSR and give me a reasoned explanation for why those references read upon the paragraph and why, in fact, it would be obvious. If we go down to CFR 1.104, it's pretty clear that it's the examiner that's obligated to describe it. Okay, so there's one reference being relied on and specific paragraphs are cited for the particular limitation. And you're saying that doesn't meet the regulation. But just for a minute, backing away from whether it meets the regulation or not, why couldn't you respond to it? I could have, but it would have required me to guess at what the examiner was basing the rejection upon, which, in my point of view, is doing the examiner's job and is not something that's necessary for us to do. Aren't I correct that your original view was that Rose wasn't, like, even pertinent priority? Well, it's the primary, right? No, but you wanted it off the table. Yeah, I would have loved that. You lost that argument. I lost that argument. So when the examiner comes back and says paragraph 43 of Rose, why couldn't you have said, where do you find any of these and then give your kitchen sink list of the six limitations? Where do you find any of those and I don't see that in 43? I guess we were speaking past each other because in my mind, when I explained to the examiner that I've reviewed those paragraphs and I'm unable to find the combination of elements being claimed. What would you say? You couldn't find the combination. That's different from not finding the limitations. That is true. So your argument is many layers. First, Rose doesn't count. Rose doesn't teach the specific limitations. It doesn't teach the combination of limitations but you're not saying to the examiner any of those. Okay. All you're saying is Rose doesn't apply. Um. When he comes back and cites as Judge Stahl was saying. As I said before, examiners and practitioners butt heads in this manner where the examiner is giving me nothing more. I would make the comment that I don't see in this reference what's at stake. The problem is you're now left without a response to a rejection. And so we don't know you know whether the exam where the examiner came up because you simply said well the limitations aren't shown. Rather than saying tell me where in. Where? Where does it teach it? Okay. That would force him to come forward and tell you where. But I still think the burden falls on the patent office to make that prima facie rejection beforehand. I don't think that I don't think the examiner I don't think The question for us is whether or not a prima facie rejection was made by citing the paragraphs I don't think the examiner ever got to that point of giving me the prima facie rejection that I needed in order to respond in a knowing manner. For me to respond in the manner you guys are suggesting would have required me to prepare something Well you would have told us but you would have told us what your interpretation of the windows was. Like, was it actually opening entirely within the magazine or was it also meant to reach opening outside the magazine at the home side of the person you're making their reservation for? Presumably you want your claim to be broad, right? Sure. So you'd want both. But you never told the examiner that. No, we spoke past each other. I would agree on that. But the question comes down to who's got the knowledge and     would be.  it is. Okay. Thank you very much. Thank you. Good morning.      That concludes the proceedings this morning. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.   Thank you.